IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PETER D. DOCHINEZ**, <br> **BLACK DIAMOND ENERGY, INC.** <br> and **BLACK DIAMOND ENERGY** <br> **OF DELAWARE, INC.**, <br><br> Plaintiffs, <br><br> v. <br><br> **MITCHELL RESOURCES, LLC**, <br><br> Defendant. | 2:11cv984 <br> **Electronic Filing** |

## OPINION

On June 30, 2011, Peter D. Dochinez, Black Diamond Energy, Inc. ("BDE"), and Black Diamond Energy of Delaware, Inc. ("BDE of Delaware") (collectively "plaintiffs") commenced this action against Mitchell Resources, LLC ("defendant"), in the Court of Common Pleas of Allegheny County, Pennsylvania. Defendant removed the action on July 29, 2011. Presently before the court is plaintiffs' motion to enforce a settlement agreement. An evidentiary hearing on the motion was held on August 5, 2013, and the parties submitted supplemental briefs in support of their respective positions on August 7, 2013. For the reasons set forth below, the motion will be granted.

The claims in plaintiff's complaint were predicated on an agreement wherein plaintiffs agreed to raise $1,000,000.00 in order to assist defendant in acquiring all loan instruments and thus control over the underlying assets that BDE, BDE of Delaware, Koval Resources and Koval Energy had pledged to secure loans with S & T Bank. These promissory notes, security agreements, mortgages, assignments, pledges, loan agreements and other instruments were

secured by assets in the form of gas and mineral leases. The leases constituted property rights located in what is known as the Powder River Basin in Northeastern Wyoming. This region has been very active for years in the exploration and extraction of natural gas from tertiary coal seams. In exchange, defendant was to receive $65,000.00, certain leasehold rights to mineral and gas rights in the Powder River Basin and an option to purchase additional mineral rights and gas leases there. See generally Complaint (Doc. No. 1-1) at ¶¶ 2-5, 13-17, 19-23.

Plaintiffs' complaint alleged that the parties had completed the agreement in part. The $1,000,000.00 assertedly had been raised and transferred to S & T Bank, defendant had acquired all of the loan instruments and related chattel paper from S & T Bank and defendant had received half ($32,500.00) of the money it was to be paid. The agreement purportedly broke down prior to final completion and plaintiffs advanced claims for specific performance, breach of contract and fraud.

On August 1, 2011, defendant filed a motion to dismiss based on abstention. On August 26, 2011, defendant's initial counsel filed a motion to withdraw. After a hearing initial defense counsel was permitted to withdraw on November 10, 2011. The motion to dismiss was denied by Memorandum Order issued on February 13, 2012.

On March 19, 2012, defendant attempted to file a "pro se" answer, which plaintiffs moved to strike on March 22, 2012. Discussions with defendant's principal, Robert W. Mitchell ("Mitchell") and plaintiffs' lead counsel led to a determination that a conciliation conference might prove to be beneficial. See Order of April 16, 2012 (Doc. No. 26).

A conciliation conference was held on June 6, 2012, with Peter Dochinez, Eric Koval (the principal for the remain plaintiffs), and Mitchell in attendance.[1] After several hours a tentative settlement was reached among the parties. The essential terms of the settlement were placed on the record. Specifically, the parties stipulated and understood the following to be the contours of their agreement:

> Mark Mohney, Law Clerk: We're convened in the case of Peter Dochinez, et al versus Mitchell Resources, LLC. Counsel and principals for the parties have been here working under the Court's supervision, in an effort to find an amicable resolution to the current dispute. They have outlined some material terms of an agreement that they have reached they want to put on the record, and I'll have a little bit more to add at the end. But at this point, Mr. Kaminski, counsel for the plaintiffs, is going to summarize those terms for us.

> "Mr. Kaminski: Sure. First off, all assets of Black Diamond Energy and Black Diamond Energy of Delaware . . . related to the production of oil and gas in the following counties, Carbon, Sublette, Johnson, Campbell, Sweetwater, Weston, and Unita [and all] of the Green River Basin will be conveyed to Mitchell Resources or its designee.

> This sale shall specifically exclude the Castle Creek Field, Crimson Unit, 29 Stage Trail Road, and the chose-in-action against Encana, E-N-C-A-N-A. The purchase price for the assets will be $18 Million. It will be payable, $2 Million on or before June 30th, and the remainder over a two-year term, with payments of $2Million in each quarter, commencing sometime in the fourth quarter of 2012, on a date to be agreed upon by the parties.

> The liens and mortgages that are currently held by Mitchell Resources are to be conveyed as part of this transaction are to remain in place on these assets to secure the obligations, with the holder having a covenant not to foreclosure as long as the payments are current.

> The holder is to be an entity under the control of Pete Dochinez.

---

[1] Mitchell is a roofer by trade in Centennial, Colorado. He formed Mitchell Resources for the specific purpose of carrying out the transactions involving the purchase of plaintiffs' pledged collateral from S & T Bank. He appeared at the conference pursuant to an order that direct: "Robert W. Mitchell and any other individuals necessary to make binding decisions for Mitchell Resources, LLC, shall physically be present for defendant." Mitchell did not have any other principal from Mitchel Resources attend the conference. He appeared with new counsel for defendant who had recently been retained.

On or before June 30th, Mitchell Resources will convey what we will refer to as the S&T paper, to the entity controlled by Mr. Dochinez.

As part of the transaction, the parties will enter into mutual and general releases. Mitchell Resources will effectuate the takeover as registered operator of all of the gas wells being transferred by July 31, 2012.

The property is to be conveyed by quit claim deed as is/where is, with no representations or warranties.

The BDE liens on the Marquiss Field are to be released on or before July 5th.

The transaction will be subject to confidentiality provisions. The transaction is being entered into based upon representations made by BDE. The taxes and mechanic's liens on the property are in the vicinity of 1.5 million dollars.

Mark Mohney, Law Clerk: I will add, Defendants, Mr. Mitchell, here for the defendant needs to speak to others before he can give a final confirmation. He has represented that to the best of his abilities, that these terms will be acceptable. He has agreed to do that within the next forty-eight hours.

The Court will schedule and reconvene this conciliation conference for Friday afternoon. In the event Mr. Mitchell is able to convey to the Court, or communicate to the Court that all these terms and conditions are agreed upon and are satisfactory to all entities involved on Mitchell Resources' side of the transaction, then that conference will be cancelled and these will be considered to be the material terms to which each party has bound themselves.

Also, both parties are operating under the assumption that all of this as well as other additional terms and conditions will be reduced to a final settlement agreement."

On June 7, 2012, current defense counsel submitted a letter indicating that Mitchell had spoken to his investor and the only additional requirement was a provision providing a limited warranty with regard to existing equipment at the existing wells within the scope of the conveyance. Specifically, this letter provided in pertinent part:

Pursuant to the understanding reached during the mediation conference yesterday, please be advised my client, Mitchell Resources, LLC reviewed the proposed settlement with it principal investor. The investor is prepared to approve the proposed settlement agreement to contain a clause with one exception. The investor requires the Settlement Agreement to contain a clause substantially in the following form:

The Black Diamond entities shall furnish at the time the Settlement Agreement is executed a list of all equipment existing at each well, which date will appear on the production records filed with the State of Wyoming (Existing Equipment).

Mitchell Resources, LLC shall have thirty (30) days after execution of the Settlement Agreement within which to inspect each well site to determine whether the Existing Equipment remains on each well site as of the [date] of such inspections. To the extent any such Existing Equipment is no longer at the well site, Mitchell Resources shall have the right to replace the missing equipment and deduct the cost thereof from the purchase price and provide the Black Diamond entities a copy of the receipts for the replacement equipment within six (6) months.

On the afternoon and into the evening on June 7, 2012, the mediator conducted additional negotiations between the parties regarding the investor's request for this provision. With one caveat concerning pump jacks that had been removed and sold by BDE in 2010, this language was acceptable to plaintiffs. Mitchell confirmed that he and his investor would accept a carved-out of the 19 pump jacks and thus there was an agreement. All counsel and the parties advised that (1) they were in agreement on terms of the limited warranty provision governing existing equipment, (2) the parties had reached a binding agreement and (3) there was no need to engage in further negotiations. Accordingly, on June 8, 2012, the court concluded that the parties had bound themselves to an enforceable contract of settlement and ordered the case closed statistically. The Order specifically provided in pertinent part:

AND NOW, this 8th day of June, 2012, the court having confirmed with counsel that both parties have assented to the material terms placed on the record on 6/6/12 and agreed to additional terms negotiated on 6/7/12 and that a settlement has therefore been reached as to all aspects of plaintiffs' complaint and the only remaining matter is the submission of a stipulation for settlement and discontinuance; therefore, with no further action being required by the court at this time, the following order is entered:

IT IS ORDERED that the Clerk of Court mark the above case closed.

* * *

Jurisdiction is retained over the completion and execution of the settlement agreement.

Order of June 8, 2012 (Doc. No. 31).

At no time prior to the entry of the June 8, 2012, Order did Mitchell make a demand or raise as a condition of agreement that the general partner(s) of BDE and BDE of Delaware obtain by majority of partnership members the affirmative vote in each effected limited partnership to approve (and authorization to complete) the settlement agreement outlined above. Nor did either party raise or insist upon time being of the essence in completing the settlement documents and closing on the transaction.

Plaintiffs' counsel completed a draft of the written settlement agreement on June 15, 2012, which was circulated among counsel and the principals. On July 2, 2012, one of defendant's counsel who was not present at the June 6, 2012, conciliation responded to the draft and a raised for the first time counsel's gained understanding that "the leases in question are held by limited partnerships and that the terms of such partnerships prohibit transfer of partnership assets without the approval of a majority of the limited partners. If my understanding is correct, it appears that your clients do not have the ability to transfer the subject leases." Email from Attorney Yukevich to Attorney Kaminski dated July 2, 2012 (Defendant's Hearing Exhibit 2). Plaintiffs' counsel responded: "BDE and BDE Delaware are the general partners. They will execute on behalf of the partnerships. This was not a condition of the settlement. At all times Mr. Mitchell was aware of this situation." Email from Attorney Kaminski to Attorney Yukevich dated July 2, 2012 (Defendant's Hearing Exhibit 3). He further reiterated that "this was a quitclaim situation." Id.[2]

On July 17, 2012, BDE as managing general partner sent a notice to all limited partners providing them with an overview of a favorable ruling by the Wyoming Supreme Court in a

---

[2] Mitchell and the entity plaintiffs were far from strangers by the time the conference was held. They had been involved in legal conflict in a number of forums and venues for some time. A mutual deep-seated distrust had arisen as a result of these actions and undertakings.

lawsuit in which the limited partnerships had sued S & T Bank for negligence, breach of fiduciary duty, breach of the covenant of good faith and fair dealing and related claims based on the theory that S & T Bank had sold the pledged collateral of BDE and BDE of Delaware to defendant for a grossly undervalued amount. Black Diamond Energy Letter to Limited Partnership Investors of July 17, 2012 (Defendant's Hearing Exhibit 4). The notice separately provided an overview of the settlement agreement reached at the conciliation conference on June 6, 2012, in the instant case, noted that the sale could constitute the disposition of a significant portion but not all of the partnerships' assets, and asked that any partner who wanted to vote "no" to the sale of assets inform the managing general partner of the same. The notice provided a return form to be completed and mailed to Certified Public Accountant Eric Rossi in Pittsburgh, Pennsylvania. Id. CPA Rossi reported to the managing general partner of BDE on August 20, 2012, that only a handful of negative votes had been received in each partnership and therefore the majority of investors had consented to the sale. Eric Rossi's Letter of August 20, 2012 (Defendant's Hearing Exhibit 5). The parties were unable to resolve their differences on this point and the pending motion to enforce was filed on August 31, 2012.

The mediator had further discussions with counsel about the impasse underlying the motion to enforce in early April of 2013. On April 12, 2013, the 29 limited partnerships that had an interest in the sale moved to join in plaintiffs' motion to enforce. After defense counsel advised that there was no opposition to the motion, the motion was granted. See Order of April 17, 2013 (Doc. No. 42). A status conference was then scheduled for May 16, 2013.

At the status conference the mediator met with counsel to further explore avenues for resolution of the parties' disagreement short of resolving the pending motion to enforce. At that conference plaintiffs' counsel provided a report from CPA Rossi indicating that the limited

7

partners had been asked through correspondence sent on March 15, 2013, to vote affirmatively on the sale of assets and the responses indicated that sale had been approved (overwhelmingly) in all partnerships but one, and, although an affirmative vote was not needed in that partnership, plaintiffs were still attempting to get that approval. See Status Conference Memorandum of May 17, 2013 (Doc. No. 44); Defendant's Hearing Exhibit 8. A follow-up conference was set for May 30, 2013.

At the status conference of May 30, 2013, plaintiffs' counsel tendered the report of CPA Rossi verifying that an affirmative majority vote in the last partnership had been obtained. Defense counsel then reported that defendant's financier was no longer interested in following through with the transaction and therefore defendant would not be able to perform the financial component of the agreement. See Status Conference Memorandum of May 30, 2013 (Doc. No. 46); Plaintiffs' Hearing Exhibit 6. Through counsel defendant conveyed two alternative proposals for resolution of the entire litigation. Additional conferences were held on June 13, 2013, July 11, 2013, and July 24, 2013, in an effort to reach an agreement, but the parties were unable to do so.

An order was entered on July 26, 2013, scheduling a hearing on the motion to enforce and directing the parties to "submit any additional evidence or arguments on the pending motion (not previously submitted)" and advising them that the "motion will be deemed to be ripe for disposition at the conclusion of the hearing." Order of July 26, 2013 (Doc. No. 54). The parties appeared at the hearing and presented the testimony and exhibits each wanted to advance in support of their respective positions. Supplemental briefs were permitted and received on August 7, 2013. See Doc. No.s 64 & 65. The matter is ripe for disposition.

Plaintiffs maintain that a settlement was reached in June of 2012 because the parties had a meeting of the minds, agreed to sufficient material terms to create an enforceable agreement at that juncture, and sufficiently memorialized those terms on the record and through a follow-up letter/negotiations. Mitchell's insistence on expressed partnership-member approval was not a term of the agreement and did not become a bar to enforcement of the agreement when it was raised after the fact because no mutual mistake of fact or other defense excusing performance by defendant exists.

Defendant argues that "the so-called settlement agreement of June 6, 2012 was incomplete, devoid of essential material terms, and legally insufficient to constitute a binding, enforceable agreement." Numerous disputed material terms purportedly remained to be resolved before a complete, integrated agreement could be reached and the parties had differences as to what the terms of the contemplated final agreement would be. The agreement placed into the record made clear that everything was contingent on there being a final, written settlement and release that was approved by counsel, which never occurred. The summary provided only a few of the terms needed to have a binding agreement and those terms were ambiguous as to what was meant by the understanding that "the property is to be conveyed by 'quitclaim' deed, as/where is, no representations or warranties." This ambiguity shows that Mitchell's insistence that plaintiffs be able to assure that they as grantors had the legal power and authority to convey the vendor's assets was reasonable under the circumstances. Further, defendant contends that the chronology of events after June of 2012 evidence a substantial effort to reach alternative settlements of the parties' dispute and this provides additional support for the proposition that a final, enforceable agreement had not been reached in June of 2012.

The parties reached an enforceable agreement in June of 2012. "Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." <u>Tedesco Manufacturing CO., Inc. v. Honeywell International Inc.</u>, 371 Fed. Appx. 316, 319 (3d Cir. 2010) (quoting <u>Saudi Basic Inds. v. Exxon Corp.</u>, 364 F.3d 106, 113 (3d Cir.2004) (citations omitted). That evidentiary hearing was conducted on August 5, 2013. When the testimony and exhibits generated from that hearing are examined in conjunction with the applicable law, the record demonstrates that no material issue of fact remains for trial and an enforceable contract of settlement was reached in June of 2012.

"Settlement agreements 'are regarded as contracts and must be considered pursuant to general rules of contract interpretation.'" <u>Id.</u> (quoting <u>Miller v. Ginsberg</u>, 874 A.2d 93, 99 (Pa. Super. 2005) (quoting <u>Friia v. Friia</u>, 780 A.2d 664, 668 (Pa. Super. 2001)). "The fundamental rule in construing a contract 'is to ascertain and give effect to the intention of the parties.'" <u>Miller</u>, 874 A.2d at 99 (quoting <u>Friia</u>, 780 A.2d at 668).

For a variety of reasons, the common law has long recognized that as a general matter interpretation of a memorialized agreement is a task to be performed by the court rather than a jury. <u>Gonzalez v. U. S. Steel Corp.</u>, 398 A.2d 1378, 1385 (Pa. 1979). Adherence to this approach "contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike." <u>Id.</u> (quoting Restatement (Second) of Contracts § 283, Comment d (Tent. Draft No. 5, March 1970)).

Defendant's position that the June 2012 understanding could not have constituted an enforceable contract because the parties anticipated that additional terms would be agreed upon in the final settlement documents, closing and release is misplaced. First, it is well settled in Pennsylvania that where the parties have agreed on the essential terms and the only remaining

act to be done is the formalization of the agreement, the latter will not prevent the contract from being enforceable. Field v. Golden Triangle Broadcasting, Inc., 305 A.2d 689, 693 (Pa. 1973); Melo-Sonics Corporation v. Cropp, 342 F.2d 856, 859-860 (3d Cir. 1965). In this regard, Section 26 of the Restatement of Contracts permits parties to bind themselves contractually even if they intend to draft a formal document at a later date. Field, at 693; Goldman v. McShain, 247 A.2d 455, 459 (Pa. 1968). In other words, "[i]f the parties agree to all material terms and only have a formalization remaining, a binding contract is formed; the focus is on the mutual agreement and an intent to be bound by the agreement." Falls v. State Farm Ins. Mut. Auto. Ins. Co., 774 F. Supp.2d 705, 710-11 (M.D.Pa. 2011). As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. 1993).

Second, it is equally well-established that the intent of the parties to a memorialized agreement is to be ascertained in the first instance from the terms they chose to use, and where those terms are clear and unambiguous, the intent must be ascertained from the expressed language chosen by the parties. Martin v. Monumental Ins. Co., 240 F.3d 223, 232-33 (3d Cir. 2001). "[T]he focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). Ascertaining the intent of the parties is a question of law under such circumstances. Seven Springs Farm, Inc. v. Croker, 801 A.2d 1212, 1216 (Pa. 2002) (quoting Community College of Beaver County v. Community College of Beaver, 375 A.2d 1267, 1275(Pa. 1977)); Restatement (Second) of Contracts § 212 Comment d. In contrast, when the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury.

Community College of Beaver County, 801 A.2d at 1275; Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994).

Here, the parties placed on the record on June 5, 2012, an understanding that the terms being memorialized by the court reporter would "be considered to be the material terms to which each party has bound themselves" provided those terms were acceptable to others who needed to be consulted on defendant's side of the transaction. Transcript of June 5, 2012. Mitchell had reserved the ability to confirm whether those terms were acceptable to his investor. After doing so Mitchell raised the issue of equipment having been removed from the wells by plaintiffs in the recent past through defense counsel's letter of June 7, 2012. That issue was resolved by the additional negotiations in the evening of June 7, 2012, and the parties agreeing to the partial warranty given as to the equipment on the wells. No other issue was raised at that time and both sides represented to each other and the court that the litigation had been reduced to an enforceable contract of settlement, thereby permitting the conference scheduled for June 8, 2012, to be cancelled and the traveling principals to return to Colorado and Wyoming.[3] By the terms of the understanding placed on the record, the parties had the intent to form a binding agreement based on the understanding that the recorded terms would be enforceable as a contract of settlement.

Defendant's attempt to interject ambiguity into the parties' agreement through their use of the phrase "the property is to be conveyed by 'quitclaim' deed, as/where is, no representations or warranties" is unavailing. "[A] contract is ambiguous under Pennsylvania law 'if, and only if, it is reasonably or fairly susceptible of different constructions and capable of being understood in'" more than one sense. Glenn Distributors v. Carlisle Products, 297 F.3d 294, 300 (3d Cir. 2002)

---

[3] Mitchell had travelled from Colorado to be at the conference and Eric Koval had traveled from Wyoming.

(quoting <u>Duquesne Light Co. v. Westinghouse Electric Corp.</u>, 66 F.3d 604, 614 (3d Cir. 1995)).

Such an ambiguity may arise where the provisions or terms used "are obscure in meaning

through indefiniteness of expression" or have a double meaning. <u>Id.</u>

Moreover, a "contract is not rendered ambiguous by the mere fact that the parties do not

agree upon its proper construction." <u>Friia</u>, 780 A.2d at 668 (quoting <u>Riccio v. American</u>

<u>Republic Ins. Co.</u>, 683 A.2d 1226, 1233 (Pa. Super. 1996)). In this regard a "court may not

ignore otherwise clear language merely because one of the parties did not anticipate related

complications prior to performance." <u>Id.</u> (citing <u>In re St. Mary Hospital</u>, 157 B. R. 235, 238

(E.D. Pa. 1993)); <u>accord</u> <u>New Charter Coal Co. v. McKee</u>, 191 A.2d 830, 833 (Pa. 1963) ("The

law demands of every man who bargains with another that he should do so only after due

reflection of the possible consequences of his bargain and if he misjudges the consequences that

could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy

his fecklessness. Absent some legally recognized infringement of the law of contract by one

party, the law will not reform a written contract so as to make a contract for the parties that they

did not make between themselves and certainly never to rescue a party who did not reasonably

foresee the consequences of his bargain.").

The use of a quitclaim deed is well understood in property conveyances. It means to

release and relinquish one's claim or right to the property and to convey all of one's interest in the

property. It does not carry with it an understanding that one is warranting fair, marketable title

as to any claim of right or encumbrance by the rest of the world. <u>See</u> <u>e.g.</u> <u>Greek Catholic</u>

<u>Congregation of Borough of Olyphant v. Plummer</u>, 12 A.2d 435, 437 (Pa. 1940) ("Quit-claim

deeds, long known to the law, are used when a party wishes to sell or otherwise convey an

interest he may think he has in land but does not wish to warrant his title. It does not purport to

convey anything more than the interest of the grantor at the time of its execution. . . . The distinguishing characteristic of a quitclaim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself.") (citations omitted). As is and where is connote the property is being conveyed in its existing location and condition with all existing faults and defects. See e.g. Industrial Rayon Corp. v. Clifton Yarn Mills, 165 A.2d 385, 386-87 (Pa. 1933) (A contract that calls for the conveyance of property "as is" and "where as" clearly and unequivocally indicates that the purchaser is taking (and is bound to pay for) the property in its existing condition and with all its faults.).

Here, the parties were negotiating terms to be used in the conveyance of property rights involving gas and mineral leaseholds and similar instruments. There was discussion on June 5, 2012, involving the potential for liens and other encumbrances to have arisen from a variety of sources, including tax and environmental liability, mechanics liens and similar sources. There was also discussion about the length of time the existing wells had gone unattended and without regular maintenance and monitoring. The parties chose to strike a deal that committed plaintiffs to convey the title they had and defendant to accept the risk and responsibility for liens and encumbrances, some of which were known to exist and be significant as of that date. This understanding was modified to a modest degree by the limited warranty regarding equipment at the wells. No other modification was negotiated.

Defendant's interpretation of the phrase to mean that BDE and BDE of Delaware would obtain an assurance that the conveyance of the property rights would be approved by all limited partners in the partnerships is an obscure and unnatural meaning to the phrase selected. There is no question that (1) title of the property could be conveyed by BDE and BDE of Delaware as the general managing partners and (2) the general partners intended to convey title. See Agreement

of Limited Partnership (Doc. No. 37-2 at § 4.02(c)(1)(i) (". . . the Managing Partner is expressly authorized to engage in making all determinations of which leases, wells and operations will be participated in by the Partnership, which Leases are developed and which Leases are abandoned, or at its sole discretion, sold or assigned to other parties . . . ."). Indeed, the limited partners were unable to convey any asset of the partnership. Id. at § 403(a)(2) ("Participants, as such, shall have no power over the conduct of the affairs of the Partnership; and no Participant, as such, shall take part in the management of the business of the Partnership, or have the power to sign for or to bind the Partnership.").

Moreover, Mitchell's testimony at the August 5, 2012, hearing indicated that his concern over the affirmative partnership vote was grounded in his deep-seated mistrust of plaintiffs' principals and their track record for litigation. From his perspective the Kovals and the BDE entities had become a very litigious group and the parties' track record in commencing and continuing with litigation made it natural for Mitchell to expect and understand that plaintiffs were warranting that they had the consent of all affected partnerships when they indicated that title would be conveyed to defendant. In other words, Mitchell's concern was not that he would not get title to the mineral and gas rights; clearly a conveyance by the general partners, the only partners who held and could convey title for the BDE entities, would transfer legal title to defendant. See Greek Catholic Congregation, 12 A.2d at 437 (quit claim deed conveys the interest/title held by the grantor). Instead, Mitchell was concerned that he might be subject to litigation from disgruntled partners who could challenge the validity of the general partner's conveyance and embroil defendant in additional litigation.

Mitchell's concern appears to have been without legal foundation. Even if the conveyance was not in accord with the partnership agreement, as general partners the BDE

entities were the only partners that could convey title. Furthermore, to the extent the general managing partners had exceeded their expressed authority, any claim for harm by a third party would require a showing that the act was a breach of fiduciary duty that had caused harm to the limited partners. See Agreement of Limited Partnership (Doc. No. 37-2) at ¶ 3.06(a) ("The Managing General Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in the Managing General Partner's possession or control, and the Managing General Partner shall not employ, or permit another to employ, such funds and assets in any manner except for the exclusive benefit of the Partnership."); In re Americo Derivative Litigation, 252 P.3d 681, 702 (Nev. 2011) ("We adopt the standard applied by Delaware courts, which requires that four elements be shown [in order to set forth a claim for aiding and abetting a breach of fiduciary duty] : (1) a fiduciary relationship exists, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach of the fiduciary relationship resulted in damages.") (citing Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)). The record is devoid of any basis to assume such harm/damages could be established. In fact, everything in the record supports the opposite conclusion.[4]

Mitchell's concern was not raised in June of 2012 when the material terms to which the parties agreed to bind themselves were struck. It was interjected after an agreement to those terms had become final and the parties were attempting to reduce their understanding to a fully integrated and detailed agreement. It involved an additional precautionary measure that entailed a significant undertaking by plaintiffs that could not have been accomplished in the manner

---

[4] Of course, during the negotiations in June of 2012 defendant could have requested and insisted on a provision that would indemnify it for any costs from any such future litigation, with such costs being offset from defendant's ongoing purchase payments. Defendant did not do so.

Mitchell was insisting on during the timeframe the parties initially set for closing and the commencement of payment. The insistence on such an after-the-fact precautionary condition precedent does not interject ambiguity into the settled property terms the parties chose to govern their binding agreement.

Defendant's contention that the enforceability of their June 2012 agreement was conditioned on the parties reaching a final, fully integrated settlement document fails for similar reasons. In resolving a dispute about the parties' intent the court is to avoid ascribing an interpretation that conflicts with the plain meaning of the language used by the parties or otherwise alters the clear import of the contract. Amoco Oil Co. v. Snyder, 478 A.2d 795, 798 (Pa. 1984). Similarly, provisions of a contract are not to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given. Continental Ins. Co. v. McKain, 820 F. Supp. 890, 897 (E.D. Pa. 1993), aff'd, 19 F.3d 642 (3d Cir. 1994); Sparler v. Firemen's Ins. Co., 521 A.2d 433, 438 (Pa. Super. 1987).

Here, the parties chose to bind themselves to the material terms that were placed on the record on June 5, 2012. They also recognized that these terms as well as other terms and conditions would be reduced to a final agreement. But this understanding could not have meant that there was no contract at that point in time. Such an interpretation would render superfluous and inoperative the understanding that the parties were agreeing to be bound by the terms placed on the record. And that understanding was the very purpose of getting the court reporter and placing the parties' understanding on the record. The Pennsylvania courts repeatedly have held that in such a setting "if the parties agree on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms." Compu Forms Control, Inc. v. Altus Group, Inc., 574 A.2d

618, 624 (Pa. Super. 1990); accord Woodbridge v. Hall, 76 A.2d 205 (Pa. 1950) (An oral

agreement to settle reached in the courthouse which included the essential terms of the

agreement between the parties was enforceable even though the parties were later unable to reach

agreement about all of the terms needed for a written settlement agreement.); Good v.

Pennsylvania Railroad Co., 384 F.2d 989, 990 (3d Cir. 1967) (oral agreement of settlement

reached in the courthouse with the intent to be bound that contains the essential terms needed for

enforcement cannot be disavowed by the failure to agree to all additional terms in subsequent a

subsequent release); Kazanjian v. New England Petroleum Corporation, 480 A.2d 1153 (Pa.

Super. 1984) ("An oral settlement agreement may be enforceable and legally binding without a

writing. Where parties have reached an oral agreement, the fact that they intend to reduce the

agreement to writing does not prevent enforcement of the oral agreement.") (same) (collecting

cases); Johnston v. Johnston, 499 A.2d 1074 (Pa. Super. 1985) (same).[5]

Finally, even assuming for the sake of argument that defendant had a right to insist on an

affirmative vote by a majority of partners in each affected partnership, any such condition

precedent was satisfied by plaintiffs within a reasonable period of time. The parties did not

make time of the essence in either their agreement in June of 2012 or the proposed settlement

documents seeking to effectuate that agreement. Plaintiffs surveyed the partners in August of

2012 CPA Rossi was able to report that there was no significant opposition to the proposed sale

and by lack of affirmative opposition the overwhelming majority of partners were in favor of the

---

[5] Defendant's approach would render every settlement agreement placed on the record directly
after a mediation session or settlement conference in the courthouse unenforceable because the
parties are never prepared to execute final agreements and releases at that point in time. This is
not to say that the parties might have further differences as to the additional terms and have an
obligation to resolve those differences through good faith and reasonable negotiations and other
means of dispute resolution. But such disagreements do not render the contract formed by the
recording of the material terms to be voidable based on such contingencies and subsequent
events.

proposed sale.  The partnership agreement did not require more.  <u>See</u> Agreement of Limited Partnership at ¶ 4.03(d)(6) ("The sale of all or substantially all of the assets of the Partnership (including, without limitation, leases, wells, equipment and production there from) shall be made only with the consent of Participants whose Agreed Subscriptions equal 50% of the Partnership Subscription.").  And while defendant notes that 10 percent or more of the limited partners could have thereafter convened a special voting session to disapprove the sale under paragraph 4.03(d)(6) prior to the conveyance, there is no basis to assume that any such undertaking was afoot.  In addition, the limited partnerships then joined in the motion to enforce, thereby creating grounds for judicial estoppel in the event the partnerships were to assert a contrary position in another court.[6]

---

[6] Judicial estoppel is a concept similar to that of collateral estoppel but "is a matter of federal law, not state law."  <u>Lowrey v. Stovall</u>, 92 F.3d 219, 223 n.3 (4th Cir. 1996).  The Supreme Court has explained the doctrine as follows:

> [the] purpose [of the judicial estoppel doctrine] is "to protect the integrity of the judicial process," <u>Edwards v. Aetna Life Ins. Co.</u>, 690 F.2d 595, 598 (6th Cir. 1982), by "prohibiting parties from deliberately changing positions according to the exigencies of the moment," <u>United States v. McCaskey</u>, 9 F.3d 368, 378 (5th Cir. 1993). <u>See</u> <u>In re Cassidy</u>, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); <u>Allen v. Zurich Ins. Co.</u>, 667 F.2d 1162, 1166 (4th Cir. 1982) (judicial estoppel "protect [s] the essential integrity of the judicial process"); <u>Scarano v. Central R. Co.</u>, 203 F.2d 510, 513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts' " (quoting <u>Stretch v. Watson</u>, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949))).  Because the rule is intended to prevent "improper use of judicial machinery," <u>Konstantinidis v. Chen</u>, 626 F.2d 933, 938 (D.C. Cir. 1980), judicial estoppel "is an equitable doctrine invoked by a court at its discretion," <u>Russell v. Rolfs</u>, 893 F.2d 1033, 1037 (9th Cir. 1990) (internal quotation marks and citation omitted).

> Courts have observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," <u>Allen</u>, 667 F.2d, at 1166; <u>accord</u>, <u>Lowery v. Stovall</u>, 92 F.3d 219, 223 (4th Cir. 1996); <u>Patriot Cinemas, Inc. v. General Cinema Corp.</u>, 834 F.2d 208, 212 (1st Cir. 1987).  Nevertheless, several factors typically inform the decision whether to apply the

In its opposition to plaintiffs' motion to enforce defendant demanded that plaintiffs be ordered "to send out notices to each of the Limited Partners of each of the affected Limited Partnership Agreements, requesting consent to the sale of the gas wells and leases to Defendant and stating what amount of the sale proceeds will be paid to each Limited Partner." Defendant's Brief in Opposition (Doc. No. 40) at 7. Even after the partnerships joined in the motion Mitchell continued to insist on an affirmative vote. Plaintiffs complied with the demand and obtained that affirmative vote in all but one partnership by the time a conference on the motion to enforce was scheduled. They further represented that they were trying to obtain an accounting of the votes

---

doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999); In re Coastal Plains, Inc., 179 F.3d 197, 206 (5th Cir. 1999); Hossaini v. Western Mo. Medical Center, 140 F.3d 1140, 1143 (8th Cir. 1998); Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (2d Cir. 1997). Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," Edwards, 690 F.2d, at 599. Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," United States v. C.I.T. Constr. Inc., 944 F.2d 253, 259 (5th Cir. 1991), and thus poses little threat to judicial integrity. See Hook, 195 F.3d, at 306; Maharaj, 128 F.3d, at 98; Konstantinidis, 626 F.2d, at 939. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See Davis, 156 U.S., at 689; Philadelphia, W., & B.R. Co. v. Howard, 13 How. 307, 335-337, 14 L.Ed. 157 (1851); Scarano, 203 F.2d, at 513 (judicial estoppel forbids use of "intentional self-contradiction ... as a means of obtaining unfair advantage"). . . .

New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001) (some citations omitted). State courts have adopted the doctrine as well. See e.g. In re Adoption of S.A.J., 838 A.2d 616, 621 (Pa. 2003) ("We reiterated that the purpose of judicial estoppel is 'to uphold the integrity of the courts by preventing parties from abusing the judicial process by changing positions as the moment requires.'") (quoting Trowbridge v. Scranton Artificial Limb Co., 747 A.2d 862, 864 (Pa. 2000)).

for the remaining partnership even though that vote was unnecessary because the sale did not involve 50 percent of its assets. They obtained that vote by the next scheduled conference.[7]

Plaintiffs surveyed the partnerships and reported that a majority of partners in the affected partnerships were in favor of the anticipated sale within weeks of Mitchel raising the demand for partnership approval. The partnerships joined in the motion to enforce approximately seven months later. After that did not satisfy Mitchell plaintiff procured the needed votes within a couple of months. At that juncture defendant renounced its intention to perform, which renunciation came after the removal of the only objection defendant had to completing the settlement agreement. Mitchell's investor's change of heart at that point did not and does not excuse defendant's performance.

Finally, as aptly noted by plaintiffs, the agreement reached in June of 2012 identified the material terms of the parties' agreement. It identified the property to be conveyed, the purchase price, the terms of payment, the form of title to be conveyed, and the manner in which the commercial paper would be transferred and held. It also provided that defendant was to become the operator with the state of Wyoming on all leases being conveyed and that all BDE liens on

---

[7] Defendant's quibbling with the formula used to explain the amount each partner would receive upon consummation of the $18,000,000.00 sale does not undermine the import of the limited partners' votes. The formula used in CPA Rossi's letter gave the total percentage that would be received upon completion of defendant's performance pursuant to the formula for returns of distributions in each partnership agreement. See Eric Rossi's March 15, 2013, Letter to Investors (Plaintiffs' Hearing Exhibit 4). Each limited partner was able to ascertain an estimate of the value of the transaction in relation to the return of investment in his or her partnership agreement. While defendant asserted that providing the exact dollar amount would have been a better approach, it is clear that the vast majority of these individuals were able to ascertain that the sale was in their best interest given the attendant circumstances. Nothing more was required under the partnership agreements or limited partnership law. See e.g. Agreement of Limited Partnership at ¶ 3.06(a); Sonet v. Timber Co., L.P., 722 A.2d 319 (Del. Ch. 1998) ("Delaware's limited partnership jurisprudence begins with the basic premise that, *unless limited by the partnership agreement*, the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners.") (emphasis in original).

the Marquis field were to be released. The parties agreed to keep the terms of the transaction confidential and to execute general releases. Such specificity was more than adequate to create an enforceable agreement. Compare Compu Forms Control, Inc., 574 A.2d at 623 (enforceable contract existed where essential terms were placed on the record and there was an insufficient basis to conclude that the parties' disagreement about additional contemplated terms involved an essential term to the initial agreement).

For the reasons set forth above, plaintiff's motion to enforce will be granted. An appropriate order will follow.


Date: September 23, 2013


                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge

cc:     Michael Kaminski, Esquire
        Thomas Anderson, Esquire
        Albert Zangrilli, Esquire
        Michael Yukevich, Esquire


        (*Via CM/ECF Electronic Mail*)